# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2017-0453-KSJM |
| ALON USA ENERGY, INC., DELEK US HOLDINGS, INC., DELEK HOLDCO, INC., EZRA UZI YEMIN, ILAN COHEN, ASSAF GINZBURG, FREDEREC GREEN, RON W. HADDOCK, WILLIAM J. KACAL, ZALMAN SEGAL, MAKR D. SMITH, AVIGAL SOREQ, FRANKLIN WHEELER, and DAVID WIESSMAN, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: March 27, 2019
Date Decided: June 28, 2019

Michael Hanrahan, Stephen D. Dargitz, Paul A. Fioravanti, Jr., Corinne Elise Amato, Kevin H. Davenport, Eric J. Juray, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; Lee D. Rudy, Michael C. Wagner, J. Daniel Albert, Grant D. Goodhart III, KESSLER TOPAZ MELTZER & CHECK, LLP, Radnor, Pennsylvania; *Counsel for Plaintiff Arkansas Teacher Retirement System.*

David J. Teklits, Thomas P. Will, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Mark Oakes, William Patrick Courtney, Ryan Metzer, NORTON ROSE FULBRIGHT US LLP, Austin, Texas; *Counsel for Defendants Alon USA Energy, Inc., Delek US Holdings, Inc., Delek HoldCo, Inc., Ezra Uzi Yemin, Assaf Ginzburg, Frederec Green, Mark D. Smith, and Avigal Soreq.*

Raymond J. DiCamillo, Brian F. Morris, Sara C. Hunter, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Colin B. Davis, GIBSON, DUNN & CRUTCHER LLP, Irvine, California; Mark H. Mixon, Jr., GIBSON, DUNN & CRUTCHER LLP, New York, New York; *Counsel for Defendants David Wiessman, Ilan Cohen, Ron W. Haddock, William J. Kacal, Zalman Segal, and Franklin Wheeler*.

**McCORMICK, V.C.**

Section 203 of the Delaware General Corporation Law prohibits a stockholder from engaging in a business combination with a company within three years from the date it acquires 15% or more of the company's outstanding voting equity. The statute's prohibitions do not apply under certain circumstances, including when the company's board pre-approves the transaction by which the stockholder acquires 15% or more of the outstanding voting equity.

In 2015, Delek US Holdings, Inc. ("Delek") acquired 48% of the common stock of Alon USA Energy, Inc. ("Alon") from Alon's largest stockholder. Delek paid approximately $16.99 per share. At the time of this stock purchase, Delek was interested in acquiring the entirety of Alon's outstanding stock. To avoid the three-year standstill period imposed by Section 203, Delek requested that the Alon board pre-approve the stock purchase. Alon's board granted Section 203 approval, but conditioned that approval on Delek entering into a stockholder agreement. The stockholder agreement established anti-takeover protections like those imposed by Section 203, but for a period of only a year. The agreement's prohibitions were broadly worded; they prevented Delek and its affiliates not only from acquiring over a majority of Alon's equity, but also from "seek[ing] to" acquire stock over a majority or otherwise circumventing the contractual restrictions.

According to the plaintiff, shortly after Delek executed the stockholder agreement, Delek began violating its terms.

1

During the stockholder agreement's one-year standstill period: Delek's CEO, who also served on Alon's board, publicly announced Delek's intent to acquire the remaining 52% of Alon's outstanding equity. In light of Delek's public statements, Alon's eleven-person board formed a special committee comprised of the six directors without direct ties to Delek. Representatives of Delek and the committee met six times, engaged in substantive negotiations, settled on all-stock consideration, and apparently agreed that the exchange ratio need not be at a premium to Alon's trading price. Near the end of the standstill period, the committee made a formal proposal to Delek.

After the standstill period expired in May 2016, the special committee issued two additional formal proposals to Delek, each on terms more favorable to Delek than the last. Delek had made no formal counteroffers, so the committee was effectively bidding against itself. In response to the third proposal, Delek delivered its first formal counteroffer, proposing an exchange ratio that equated to approximately $7.62 per Alon share. The special committee negotiated with Delek in the months that followed, focusing its efforts on improving the exchange ratio. By late December 2016, Delek made its best and final offer including an exchange ratio that equated to approximately $12.13 per Alon share, significantly less than the price paid by Delek only two years before. The committee received a fairness opinion from its financial advisor. Although certain of the advisor's analyses

2

yielded price ranges above the merger price, the committee and ultimately the board approved the merger. The merger was agreed to in January 2017, approved by Alon's stockholders in June 2017, and consummated in July 2017.

On behalf of itself and a class of Alon's common stockholders, the plaintiff asserts claims against Alon's board and Delek challenging the merger. The defendants have moved to dismiss the complaint, and this decision denies most of that motion.

Alongside the familiar fiduciary duty claims, the plaintiff pursues a less customary claim for breach of the stockholder agreement. The plaintiff alleges that Delek breached the stockholder agreement by seeking to enter into the merger during the standstill period. As its primary defense, Delek argues that the plaintiff is not a third-party beneficiary of the stockholder agreement and thus lacks standing to enforce it.

Under Delaware law, a third party to a contract may sue to enforce its terms if: the contracting parties intended to confer a benefit directly to that third party; they conveyed the benefit as a gift or in satisfaction of a pre-existing obligation; and conveying the benefit was a material part of the purpose for entering into the agreement. The stockholder agreement's relationship to Section 203 renders each of these elements easily satisfied. The stockholder agreement replicates aspects of the anti-takeover protections of Section 203, which provide a direct benefit to

3

stockholders of a Delaware corporation. The stockholder agreement therefore provides a direct benefit to the plaintiff. Those benefits were established in place of Section 203's pre-existing protections, or at minimum, intended as a gift to the stockholders. Because the purpose of the stockholder agreement is to restrict Delek's ability to acquire Alon, without the anti-takeover provisions, the agreement would not achieve that purpose. The anti-takeover provisions are therefore material, and the plaintiff has standing to enforce the stockholder agreement.

The plaintiff adequately alleges that Delek breached the stockholder agreement. Delek publicly announced its intent to acquire Alon stock, met with the special committee's chairperson six times, negotiated substantive terms, and proposed a deal structure, all before the standstill period expired. These acts are sufficient to state a claim that Delek breached the broadly worded anti-takeover protections of the stockholder agreement.

In another creative twist, the plaintiff asserts claims under Section 203, contending that Delek's breaches of the stockholder agreement vitiated the Alon board's Section 203 approval and restored the protections of Section 203. Under Section 203(a)(3), a business combination otherwise prohibited by the statute may be effected if it is approved by the board and authorized by at least two-thirds of the outstanding voting stock. The defendants contend that the approval of the merger by Alon's board and stockholders satisfied Section 203(a)(3). Yet for stockholder

4

approval of any corporate action to be valid, the vote must be fully informed. The defendants' argument thus fails because the plaintiff has adequately alleged multiple deficiencies in the disclosures relating to the merger. Those deficiencies include failing to fully and fairly describe the stockholder agreement, only partially disclosing facts and flaws relating to the special committee's formation, and neglecting to mention that the special committee's financial advisor increased its stock holdings in the acquirer by 60% while advising the special committee. These deficiencies not only foreclose the defendants' Section 203 defense but also support a standalone claim for breach of the duty of disclosure.

The plaintiff's claims for breach of fiduciary duty are equally viable. It is reasonably conceivable that Delek's 48% equity interest, employment of five of Alon's eleven board members, and influence over a sixth, renders Delek a controller with concomitant fiduciary duties. The merger, therefore, is presumptively subject to the entire fairness standard. The defendants argue that the business judgment standard applies under *Kahn v. M & F Worldwide Corp.* ("*MFW*")[1] because both the special committee's initial proposal and Delek's initial counterproposal conditioned the merger on the approval of a special committee and a majority of the minority stockholders. Leaving aside the uninformed nature of the stockholder vote, the defendants' argument fails in light of two recent Delaware Supreme Court decisions

---

[1] 88 A.3d 635 (Del. 2014).

clarifying that a controller must impose *MFW* conditions before the start of substantive economic negotiations.[2] Because the complaint adequately alleges that Delek engaged in substantive economic negotiations months before any *MFW* conditions were established, the defendants are not entitled to application of the business judgment standard of review at the pleadings stage.

The complaint adequately alleges unfair process and unfair price sufficient to state a claim under the entire fairness standard. In support of its unfair process assertion, the complaint alleges that Delek disregarded contractual obligations prohibiting negotiation of the merger during the standstill period. The scope of the special committee's authority to explore alternative transactions was unclear at critical stages of the negotiations. At Delek's insistence, the Alon board replaced two of the six special committee members over the course of negotiations. And the special committee's chairperson's alleged ties to Delek cast doubt on his independence. In support of its unfair price assertion, the complaint alleges that the merger consideration was keyed to the values of Alon and Delek stock, which Delek manipulated through public statements made before the merger. Also, the implied per-share merger price was at the low end of value ranges presented by the special

---

[2] *Flood v. Synutra Int'l, Inc.*, 195 A.3d 754, 763 (Del. 2018); *Olenik v. Lodzinski*, -- A.3d --, 2019 WL 1497167, at *1 (Del. Apr. 11, 2019).

6

committee's financial advisor.  These allegations are sufficient to establish unfair process and price at the pleadings stage.

## I.     FACTUAL BACKGROUND

The facts are drawn from the Second Amended Verified Class Action Complaint (the "Complaint")[3] and documents it incorporates.

### A.     Delek's Initial Acquisition of Alon Stock

Alon is an independent retailer and marketer of petroleum products.  In early 2015, Alon Israel Oil Company, Ltd. ("Alon Israel") owned approximately 48% of Alon's outstanding common stock.[4]  Because of Alon Israel's financial difficulties, Alon Israel determined to sell its interest in Alon, and reached out to Delek, a diversified downstream energy company, to explore interest in a stock purchase. After about a month of negotiations, Delek requested that the Alon board of directors (the "Board") approve Delek's stock purchase for purposes of 8 *Del. C.* § 203.

The Alon Board formed a special committee to evaluate and negotiate the Section 203 issue.  On March 19, 2015, the Board approved Delek's acquisition, but conditioned that approval on Delek executing a stockholder agreement.  Delek executed a stockholder agreement that same day.

---

[3] C.A. No. 2017-0453-KSJM Docket ("Dkt.") 37 (cited as "Second Am. Compl.").

[4] Alon Israel owned a 55% interest in Alon before it sold 7% on the open market in February 2015.

7

On April 14, 2015, Delek agreed to purchase Alon Israel's 48% stake in Alon for a total of $572.4 million or approximately $16.99 per share. That transaction (the "initial stock purchase") closed on May 14, 2015.

After the transaction closed, five of Alon's eleven directors resigned from the Board and Delek appointed five Delek executives to fill the positions: Delek CEO and President Ezra Uzi Yemin; Delek CFO Assaf Ginzburg; and three Delek Executive Vice Presidents, Frederec Green, Mark D. Smith, and Avigal Soreq (collectively, the "Delek Directors"). The remaining six directors were David Wiessman, Ilhan Cohen, Ron W. Haddock, Zalman Segal, Jeff Morris, and Yeshayahu Pery.[5] Yemin became the Executive Chairman of the Board, replacing the prior chairman, Wiessman.

## B. The Amended Stockholder Agreement

Shortly after the initial stock purchase, Delek and Alon amended the stockholder agreement (the "Amended Stockholder Agreement" or the "Agreement").[6] The Agreement prevented Delek, for the year following the initial stock purchase (the "Standstill Period"), from acquiring more than 49.99% of Alon's

---

[5] As discussed below, Morris and Pery were replaced by William Kacal and Franklin Wheeler. Kacal and Wheeler, along with Wiessman, Cohen, Haddock, and Segal, are collectively referred to as the "Special Committee Defendants." The Special Committee Defendants and the Delek Directors are together referred to as the "Director Defendants."

[6] Dkt. 26, Transmittal Aff. of Thomas P. Will in Supp. of the Opening Br. in Support of the Delek Defs.' Mot. to Dismiss Second Am. Compl. ("Will Aff.") Ex. D (cited as "Am. S'holder Agr.").

8

outstanding equity or entering into any material contract with Alon unless Delek first obtained approval from an "Independent Director Committee."[7]

This restriction took the form of a web of overlapping contractual provisions. The "Standstill Provision" (§ 1.01(a)) prohibited Delek from acquiring—or proposing or seeking to acquire—any Alon equity that would cause Delek's stake in Alon's total equity to exceed 49.99%.[8] The "No Merger Provision" (§1.05(h)) prohibited Delek from "enter[ing] into or agree[ing], offer[ing], publicly propos[ing] or seek[ing] to enter into, or otherwise be[ing] involved in or part of, any acquisition transaction, merger or other business combination relating to all or part of [Alon] . . . ."[9] The "No Circumvention Provision" (§ 1.05(k)) prohibited Delek from "tak[ing] any action intended to circumvent any of the restrictions" in Section 1.05.[10] And the "No Material Transactions Provision" (§ 2.02(a)) prohibited Delek from entering into any "material transaction" with Alon.[11] All of these restrictions also expressly applied to Delek's affiliates.

The Independent Director Committee exception appears in Section 2.02(a)'s "No Material Transactions Provision," which provides that "any material transaction

---

[7] Am. S'holder Agr. §§ 1.01(a), 2.02(a), 4.

[8] *Id.* § 1.01(a).

[9] *Id.* § 1.05(h).

[10] *Id.* § 1.05(k).

[11] *Id.* § 2.02(a).

between [Alon] . . . on the one hand, and [Delek] . . . on the other hand, and any action or transaction relating to this Agreement shall not be taken without prior Independent Director Approval or Unaffiliated Stockholder Approval."[12] A version of this exception also appears in Section 1.05(i)'s "Proposal Exception," which states that Delek can confidentially propose to the Independent Director Committee transactions otherwise prohibited by Section 1.05.[13]

"Independent Director Approval" is defined as "the approval of the majority of the members of the Independent Director Committee."[14] "Independent Director Committee" is defined as a Board committee "comprised solely of two or more Independent Directors that is duly authorized to consider and act upon the matters that require the Independent Director Approval" under the Amended Stockholder Agreement.[15] "Independent Director" is defined to exclude any directors affiliated with Alon Israel and Delek. It is undisputed that Wiessman is not an Independent Director as defined in the Agreement, Alon never formed an Independent Director Committee, and thus Delek never obtained Independent Director Approval.

---

[12] *Id.* § 2.02(a).

[13] *Id.* § 1.05(i).

[14] *Id.* § 4.

[15] *Id.*

10

## C. Events Leading to the Challenged Merger

### 1. Actions taken during the Standstill Period

According to the Complaint, Delek desired to own 100% of Alon's equity since the initial stock purchase. In early 2015, however, Alon Israel's financial difficulties propelled Delek away from a "full merger" and caused the parties to work to close the initial stock purchase "as quickly as possible," as Delek's Yemin publicly stated during a May 2015 earnings call.[16]

In July 2015, Wiessman proposed that the Board form a special committee of directors to respond quickly to any transaction offers received from Delek (the "Special Committee"). Wiessman proposed appointing to the Special Committee all directors except for the five Delek Directors. The Board did not take formal action to constitute the Special Committee at the July meeting.

In August 2015, Yemin commented during a public earnings call on Delek's intention to acquire the remaining Alon stock, stating that "obviously . . . we are not in the business of holding 48% in a company."[17]

Although the Board had not formally constituted or empowered the Special Committee, the committee members met on September 29, 2015. At that meeting, the committee appointed Wiessman as chairman. On October 8, Wiessman

---

[16] Second Am. Compl. ¶ 36.

[17] *Id.* ¶ 59.

11

contacted Yemin and inquired "whether there was a transaction that Delek would contemplate in the near term of which the Special Committee should be aware."[18] Yemin and Wiessman met on October 30, and Yemin told Wiessman that "any deal between Delek and Alon would need to be a stock-for-stock deal due to leverage limitations[.]"[19]

Alon's public disclosures elliptically state that by October 30, 2015, "questions had arisen 'among Alon Board members regarding the establishment of the Special Committee.'"[20] Alon did not disclose the questions or who specifically raised them. On October 30, the Board formally approved the formation of the Special Committee and authorized the Special Committee to engage advisors. The committee retained J.P. Morgan Securities LLC ("J.P. Morgan") as its financial advisor and Gibson, Dunn & Crutcher LLP as its legal counsel.

Although the Board formally constituted the Special Committee in October 2015, the Board did not fully delineate the committee's powers until October 2016— a year later. It was unclear during that period whether the Committee had the authority to explore alternative transactions or reject a deal with Delek.

---

[18] *Id.* ¶ 61.

[19] *Id.* ¶ 62.

[20] *Id.* ¶ 63.

12

In December 2015, Yemin told Wiessman that "any deal with Alon would need to be at an exchange ratio reflecting a discount to current Alon market price."[21] Wiessman responded by raising the prospect of Alon issuing its stockholders a one-time cash dividend to offset such a discount. Yemin stated that Delek was unlikely to support a special dividend. Later that month, Delek and Alon entered into a confidentiality agreement allowing the exchange of non-public information. And Wiessman and Yemin discussed a set of Special Committee talking points on potential transaction terms, including terms related to price and a special dividend.

By January 2016, Delek released an investor presentation that included information on Delek's plans to either acquire the remaining 52% or acquire an additional 3% of Alon stock. The latter transaction would give Alon Israel majority stock ownership. Internally, Delek commenced a process for the eventual disposition of its retail business to alleviate potential antitrust hurdles to a business combination with Alon and provide liquidity for any cash component of the deal.

That month, negotiations between Yemin and Wiessman continued. On January 27, 2016, Yemin told Wiessman that Delek disfavored a stock-for-stock deal at then-current market prices and that the exchange ratio would need to be at a discount to Alon's stock price.

---

[21] *Id.* ¶ 66.

That same day, Yemin proposed replacing two Alon directors—Morris and Pery—with two directors selected by Delek, Kacal and Wheeler. Soon after, Delek and Alon amended the Amended Stockholder Agreement on January 29, 2016, to nominate Kacal and Wheeler to the Board.[22] That same day, Delek informed Alon that it would provide "at least 14-days' notice" before increasing its ownership stake above 50%.[23]

In February 2016, Yemin shifted gears, telling Wiessman that Delek was exploring paying 80% of the merger consideration in cash.[24] Wiessman responded that the Special Committee would expect a premium on the cash consideration. Then, the Special Committee met on February 23, 2016, and decided to prepare a proposal letter for Delek suggesting a stock-for-stock merger. They decided to propose an exchange ratio based on then-current market prices instead of any premium deal. The Special Committee left it to Wiessman to determine whether to deliver the letter based on the outcome of a meeting with Yemin.

_____

[22] The amendment to the Amended Stockholder Agreement also included Board resolutions determining that the Delek Directors were independent and amending Alon's bylaws to extend supermajority voting requirements for the removal or replacement of Yemin as Alon's Board Chairman. It further added, revised and replaced various provisions of the Amended Stockholder Agreement relating to the nomination of directors, termination of the Amended Stockholder Agreement and Board composition. Delek's proposed Board nominees Kacal and Wheeler were later elected to the Board and appointed to the Special Committee in May 2016.

[23] Second Am. Compl. ¶ 82.

[24] *Id.* ¶ 86.

In March 2016, Yemin revised its message again, informing Wiessman that Delek was exploring paying 50% of the merger consideration in cash, and that Delek understood (based on their previous discussions) that such a structure would require a premium. Wiessman rejected the proposal, although it would involve a premium, responding that such a structure was not acceptable because it would trigger "make whole" payments under Alon's debt covenants and be a taxable event for Alon's stockholders.[25] Wiessman again proposed a special dividend, which Yemin again rejected.

In April 2016, the Special Committee, through Wiessman, delivered a letter to Delek proposing an acquisition of Alon in a stock-for-stock deal with an at-the-market exchange ratio of 0.687 shares of Delek stock for each share of Alon common stock. This proposal raised for the first time that any deal should be conditioned on Special Committee approval and a majority-of-the-minority vote. The proposal also asserted that synergies would generate at least $100 million in annual cost savings between the companies. Yemin rejected the proposed market-price-based exchange ratio and disputed the Special Committee's assertion as to expected cost synergies.

On May 6, 2016, Yemin confirmed on Delek's quarterly earnings call that these negotiations had taken place. Yemin further stated that "the independent directors of Alon understood that 'it doesn't make sense' for there to be a transaction

---

[25] *Id.* ¶ 89.

at an exchange ratio based on current market prices."[26]  The next day, Alon's stock price fell by 7%, thereby pushing any exchange ratio in Delek's favor.  The Special Committee expressed its desire to respond publicly to Yemin's comments, but Delek demanded that the Special Committee refrain.  A reasonable inference is that Yemin's public comments and muzzling of the Special Committee were intended to manufacture market conditions favorable to Delek in a stock-for-stock transaction.

### 2.  Actions taken after the Standstill Period

The Standstill Period expired on May 15, 2016.  Three days later, Delek sent the Special Committee a letter informing it that Delek would be in contact when market conditions improved.  Ignoring Delek's "we'll be in touch" communication, on May 25, 2016, the Special Committee sent a new written proposal to Delek lowering the proposed stock-for-stock exchange ratio to 0.615 in Delek's favor.

By June 13, 2016, Delek had yet to provide a substantive response to either one of the Special Committee's two written proposals.  The Special Committee considered issuing a press release announcing that it was authorized to explore strategic alternatives.  Again, Delek sought to restrict Alon's public statements. Yemin objected to the press release, contending that the Special Committee lacked the authority to explore strategic alternatives that did not involve Delek.  The Special Committee capitulated to Yemin's demands, issuing a revised press release.

---

[26] *Id.* ¶ 94.

On October 13, 2016, the Special Committee submitted a third written proposal, bidding against itself again by lowering the proposed exchange ratio to a range of 0.527 to 0.563.

The next day, Delek delivered its buyout proposal to the Special Committee, which called for an all-stock transaction with a fixed exchange ratio of 0.44 Delek shares for each Alon share, then-equating to $7.62 per Alon share based on Delek's closing price of $17.32. Delek's proposal provided that the transaction would require approval "by a special committee . . . comprised entirely of directors that are independent of Delek" and the holders of a majority of the non-Delek-affiliated Alon stock.[27]

About two weeks later, on October 27, 2016, the Board adopted resolutions that permitted the Special Committee "to decline any proposal from Delek and to review and evaluate strategic alternatives[.]"[28] This adoption came after Yemin communicated at least twenty-six times with Wiessman or the Special Committee, and the parties had largely agreed upon deal structure.

In December 2016, Delek sought prompt consummation of the deal, but J.P. Morgan provided a financial analysis showing that Delek's October 14 offer understated Alon's intrinsic value.

---

[27] *Id.* ¶ 111.

[28] *Id.* ¶ 115.

By December 24, 2016, Wiessman had suggested to Yemin that the Special Committee would be willing to agree upon an exchange ratio of 0.539. After consulting with J.P. Morgan, on December 27, 2016, Wiessman proposed a 0.504 exchange ratio. The next day, Yemin provided Wiessman with Delek's "best and final" offer reflecting the 0.504 exchange ratio.[29] The Special Committee then instructed its legal counsel and Wiessman to move forward with finalizing the other deal points and a merger agreement.

On January 2, 2017, the Special Committee met to discuss the merger agreement and deal terms. J.P. Morgan presented its financial analysis and delivered an opinion that the exchange ratio was fair to Alon stockholders. Although J.P. Morgan provided a fairness opinion, certain of J.P. Morgan's analysis also did not support the merger consideration. The exchange ratio implied a per share merger price of $12.13, representing only a 6.6% premium to Alon's closing price on the same day. By contrast, J.P. Morgan's sum-of-the-parts analysis yielded a per share price range of $15.60 to $18.90, and J.P. Morgan's two discounted cash flow analyses yielded price ranges above the merger price. In assessing price, the Special Committee relied in part on a "relative valuation" methodology, which focused on the trading prices of Alon's stock and Delek's stock as opposed to the intrinsic value

---

[29] Will Aff. Ex. A, Alon USA Energy, Inc., Proxy Statement (Schedule 14A) (May 30, 2017) (cited as the "Proxy") at 115.

18

of Alon. This valuation approach did not account for potential manipulation of the companies' stock trading prices. The Complaint alleges other problems affected J.P. Morgan's analysis and the projections on which it was based.[30]

Also, according to the Complaint, and unbeknownst to the Special Committee, between August 8, 2016 and November 4, 2016, J.P. Morgan and its affiliates had increased their holdings in Delek by almost 60%.[31]

On January 2, the Special Committee unanimously adopted resolutions determining that the deal was advisable, fair, and in the best interests of Alon and its public stockholders, approving the deal, and recommending it to the Board.[32] Shortly after that, the Board met and adopted resolutions approving the deal and recommending that Alon's stockholders vote in favor of the deal.[33]

---

[30] The Complaint also alleges that the Special Committee failed to inform itself that: (1) the Delek Directors participated in the creation of Alon's financial forecasts used in negotiations with Delek. Second Am. Compl. ¶¶ 144, 206. (2) The Special Committee commissioned projections that "excluded management's best estimates of the positive future revenue impact of planned growth initiatives." *Id.* ¶ 121; *see also id.* ¶¶ 150, 155. And (3) J.P. Morgan's valuation analyses did not account for the value of acquiring limited partner interests in Alon USA Partners, LP, discussed below. *Id.* ¶¶ 157–59, 207.

[31] J.P. Morgan and its affiliates purchased 573,154 shares of Delek stock, bringing their overall beneficial ownership to 1,542,001 shares and raising their ownership stake to 2.5%.

[32] Proxy at 118.

[33] *See id.* The parties dispute whether the Delek Directors recused themselves from the vote.

19

In connection with the transaction, Wiessman and Haddock secured post-merger directorships with Delek entities, and Wiessman retained his executive chairman role at Alon Partners G.P.

Before the parties announced the merger, Delek developed a plan to capitalize on Alon's interests in Alon USA Partners, LP (the "Partnership"), the entity through which Alon operates its wholesale marketing and certain refining operations. Alon wholly owned the Partnership's general partner and owned 81.6% of the Partnership's limited partner interests. The remaining 18.4% of the Partnership's limited partner interests were publicly held. According to the Complaint, Delek and Alon also negotiated Delek's post-merger acquisition of the remaining 18.4% of the limited partner interests contemporaneously while negotiating the merger. Also according to the Complaint, Wiessman's son served on the board of the Partnership's general partner.

### D.    The Merger

On January 3, 2017, Alon and Delek announced their entry into the Agreement and Plan of Merger. The merger price represented a 6.6% premium to Alon's closing price on the day of the announcement. On May 30, 2017, Alon issued a Proxy Statement ("Proxy")[34] informing its stockholders of the proposed merger. At a special meeting of Alon stockholders, held on June 28, 2017, holders of

---

[34] Will Aff. Ex. A.

approximately 89% of Alon's total outstanding shares voted in favor of the merger. According to Alon, stockholders unaffiliated with Delek owned 79% of the outstanding shares voted in favor of the merger.[35]

### E. Ensuing Stockholder Litigation

Six months after Alon and Delek announced the proposed merger, and weeks before the stockholder vote, stockholders filed three lawsuits in two federal district courts alleging disclosure deficiencies in violation of Section 14(a) of the Securities Exchange Act of 1934.[36] The plaintiff in the first-filed federal case moved for injunctive relief. Shortly after, the Arkansas Teacher Retirement System ("Plaintiff") commenced this lawsuit.

Alon opted to supplement the Proxy voluntarily. On June 16, 2017, Alon issued a supplemental disclosure describing all four lawsuits and attaching complete copies of the complaints as exhibits. Alon issued another supplemental disclosure five days later (the "June 21 8-K").[37] The plaintiffs in the federal actions voluntarily dismissed their claims.

The merger closed on July 1, 2017.

---

[35] Will Aff. Ex. L at 8.

[36] *See Page v. Alon USA Energy, Inc.*, Case No. 1:17-cv-00671 (D. Del. June 2, 2017) (Complaint); *Adler v. Alon USA Energy, Inc.*, Case No. 1:17-cv-00742 (D. Del. June 13, 2017) (Complaint); *Phelps v. Delek US Hldgs., Inc.*, Case No. 3:17-cv-00910 (M.D. Tenn. June 2, 2017) (Complaint).

[37] Will Aff. Ex. K.

21

Plaintiff amended its complaint on May 8, 2018, and the defendants ("Defendants") moved to dismiss the complaint on July 9, 2018. Plaintiff again amended its complaint on September 18, 2018, and Defendants again moved to dismiss. The parties completed briefing on December 3, 2018,[38] and the Court heard oral argument on March 27, 2019.

## II. LEGAL ANALYSIS

Plaintiff's Second Amended Verified Class Action Complaint ("Complaint") asserts five counts: Count I claims that all Defendants breached the Amended Stockholder Agreement.[39] Count II claims that Defendants' breaches of the Amended Stockholder Agreement vitiated the Board's waiver of Section 203; consequently, Delek, Alon, and Holdco, Inc. ("Holdco"), an entity formed for the purpose of the merger, were subject to the prohibitions set forth in 8 *Del. C.* § 203, which they violated.[40] Count III claims that Delek, Alon, and Holdco committed conversion by taking possession over the stockholder class's Alon shares through

---

[38] Dkt. 41, Opening Br. in Supp. of the Delek Defs.' Mot. to Dismiss Second Am. Compl. ("Delek Defs.' Opening Br."); Dkt. 43, Opening Br. in Supp. of the Special Comm. Defs.' Mot. to Dismiss the Second Am. Verified Class Action Compl. ("Special Comm. Defs.' Opening Br."); Dkt. 49, Pl.'s Omnibus Answering Br. in Opp'n to Defs.' Mot to Dismiss ("Pl.'s Ans. Br."); Dkt. 54, Reply Br. in Supp. of the Delek Defs.' Mot. to Dismiss Second Am. Compl. ("Delek Defs.' Reply Br."); Dkt. 55, Reply Br. in Supp. of the Special Comm. Defs.' Mot. to Dismiss the Second Am. Verified Class Action Compl. ("Special Comm. Defs.' Reply Br.").

[39] Second Am. Compl. ¶¶ 179–86.

[40] *Id.* ¶¶ 187–91.

the merger.[41]  Count IV claims that Delek, Holdco, and the Director Defendants breached their fiduciary duties to Plaintiff and the class by consummating the merger.[42]  Count V claims that the Director Defendants breached their fiduciary duties to Plaintiff and the class by violating and failing to enforce the Amended Stockholder Agreement and Section 203 and by making materially false and incomplete disclosures in the Proxy and June 21 8-K.[43]

Defendants moved to dismiss the Complaint pursuant to Court of Chancery Rule 12(b)(6).  On a motion pursuant to Rule 12(b)(6), the Court accepts "all well-pleaded factual allegations in the Complaint as true, [and] accept[s] even vague allegations in the Complaint as 'well-pleaded' if they provide the defendant[s] notice of the claim[.]"[44]  "A trial court is not, however, required to accept as true conclusory allegations 'without specific supporting factual allegations.'"[45]  The Court "draw[s] all reasonable inferences in favor of the plaintiff, and den[ies] the motion unless the

---

[41] *Id.* ¶¶ 192–94.

[42] *Id.* ¶¶ 195–200.  Count IV also asserts a disclosure claim against Delek.

[43] *Id.* ¶¶ 201–12.

[44] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011) (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[45] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (first citing *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 65–66 (Del. 1995); then citing *Solomon v. Pathe Commc'ns Corp.*, 672 A.2d 35, 38 (Del. 1996)).

plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[46]

## A. Breach of the Amended Stockholder Agreement

Through Count I, Plaintiff claims that Defendants breached several provisions of the Amended Stockholder Agreement:  the Standstill Provision (§ 1.01(a)), No Merger Provision (§ 1.05(h)), and No Material Transactions Provision (§ 2.02(a)).[47] "To state a claim for breach of contract, [Plaintiff] 'must demonstrate:  first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff.'"[48]

Defendants do not challenge the existence of the Amended Stockholder Agreement but contend that Plaintiff lacks standing to claim breach.  They further argue that Plaintiff has failed to plead that Delek breached any provision of the Agreement.  Finally, Defendants assert that Plaintiff has failed to plead damages adequately.

---

[46] *Cent. Mortg.*, 27 A.3d at 536 (citing *Savor*, 812 A.2d at 896–97).

[47] Second Am. Compl. ¶¶ 5, 8, 182.

[48] *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 883 (Del. Ch. 2009) (quoting *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003)).

### 1. Plaintiff has standing to sue for breach of the Amended Stockholder Agreement.

Under Delaware law, only parties to a contract and intended third-party beneficiaries have standing to sue for breach of the contract.[49] Plaintiff is not a party to the Amended Stockholder Agreement but argues that it has standing as a third-party beneficiary.

Plaintiff must demonstrate three elements to qualify as a third-party beneficiary of the Agreement:

> (i) the contracting parties must have intended that the third party beneficiary benefit from the contract, (ii) the benefit must have been intended as a gift or in satisfaction of a pre-existing obligation to that person, and (iii) the intent to benefit the third party must be a material part of the parties' purpose in entering into the contract.[50]

---

[49] *NAMA Hldgs., LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 434 (Del. Ch. 2007) (citing *Comrie v. Enterasys Networks, Inc.*, 2004 WL 293337, at *2 (Del. Ch. Feb. 17, 2004)); *see also Amirsaleh v. Bd. of Trade of City of New York, Inc.*, 2008 WL 4182998, at *4 (Del. Ch. Sept. 11, 2008).

[50] *Madison Realty P'rs 7, LLC v. Ag ISA, LLC*, 2001 WL 406268, at *5 (Del. Ch. Apr. 17, 2001) (citing *Guardian Constr. Co. v. Tetra Tech Richardson, Inc.*, 583 A.2d 1378, 1386–87 (Del. Super. 1990)). *See also Oliver B. Cannon & Son, Inc. v. Dorr-Oliver, Inc.*, 336 A.2d 211, 215–16 (Del. 1975) (finding third party was "intended to be a third-party-creditor beneficiary of the [sub]contract" where the "subcontract manifest[ed] the requisite intent that [plaintiff's] proper performance of the subcontract would, to that extent, discharge [defendant's] duty to [the third-party]"); *Blair v. Anderson*, 325 A.2d 94, 96–97 (Del. 1974) ("Generally, the rights of third-party beneficiaries are those specified in the contract; but if performance of the promise [in the contract] will satisfy a legal obligation which a promisee owes a beneficiary, the latter is a creditor beneficiary with standing to sue." (citing *Astle v. Wenke*, 297 A.2d 45, 47 (Del. 1972)); *Dolan v. Altice USA, Inc.*, C.A. No. 2018-0651-JRS, slip op. at 18 (Del. Ch. June 27, 2019) (holding that corporate founders had standing to enforce a merger provision as third-party beneficiaries where the provision "intended 'to give the[m] (as beneficiar[ies]) the benefit of the promised

As their first line of defense, Defendants argue generally that stockholders are not intended beneficiaries of corporate contracts simply by virtue of their stake in the entity.[51] They observe that this Court has "previously bristled at the notion that a stockholder could have 'directly enforceable rights as third-party beneficiaries to corporate contracts.'"[52] They urge caution in conferring third-party beneficiary status to a stockholder. Like other corporate decisions, the decision of whether to enforce a corporate contract falls within the business judgment of the board of directors. If the board fails to exercise that judgment consistent with its fiduciary obligations, a stockholder's sole recourse should be to sue the directors for breach of fiduciary duties, Defendants say.[53]

---

performance'" (citing Restatement (Second) of Contracts § 302 cmt. c (1981))); *Insituform of N. Am., Inc. v. Chandler*, 534 A.2d 257, 270 (Del. Ch. 1987) ("In order for third party beneficiary rights to be created, not only is it necessary that performance of the contract confer a benefit upon third parties that was intended, but the conferring of a *beneficial* effect on such third party-whether it be a creditor of the promisee or an object of his or her generosity-should be a material part of the contract's purpose." (emphasis in original)).

[51] *See generally* Delek Defs.' Opening Br. at 27–28. The Special Committee Defendants joined in and incorporated the arguments set forth in the briefing submitted by Delek, Holdco, Alon, and the Delek Directors. Special Comm. Defs.' Opening Br. at 1 n.1; Special Comm. Defs.' Reply Br. at 2.

[52] *Amirsaleh*, 2008 WL 4182998, at *4 (quoting *Orban v. Field*, 1993 WL 547187, at *9 (Del. Ch. Dec. 30, 1993)).

[53] *See Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914, 928 (Del. 2003) ("The business judgment rule embodies the deference that is accorded to managerial decisions of a board of directors. 'Under normal circumstances, neither the courts nor the stockholders should interfere with the managerial decision of the directors.'").

Delaware courts, however, have recognized stockholders receiving direct benefits from corporate contracts as third-party beneficiaries with standing to enforce those contracts.[54] For example, in *Amirsaleh*, this Court held that members of a target company were third-party beneficiaries of a merger agreement.[55] The merger agreement granted merger consideration directly to the members, with the substance of the consideration to be determined "at the election" of each member.[56] Based on this provision, the Court found that the merger agreement "manifest[ed] an unambiguous intent to benefit the [target's] Members" and that there was therefore "little legitimate question that the members . . . were intended beneficiaries . . . ."[57] The Court further held that the plaintiff member had standing to "enforce

---

[54] *See, e.g.*, *Amirsaleh*, 2008 WL 4182998, at *4 (finding that members of a company were intended beneficiaries of merger agreement entered into by the company because "the Agreement manifests an unambiguous intent to benefit the [company's] [m]embers"); *NAMA Hldgs.*, 922 A.2d at 424 ("While not a signatory to that [venture] agreement, section 12.18(j) explicitly states that NAMA is a third-party beneficiary of section 12.18 in its entirety."); *Hadley v. Shaffer*, 2003 WL 21960406, at *5 (D. Del. Aug. 12, 2003) (finding shareholders to be third-party beneficiaries of a merger agreement that required stockholder approval and contained a stockholder payment provision). *See also Comrie*, 2004 WL 293337, at *3–5 (finding employees to be intended third-party beneficiaries of stock purchase agreement that directed the grant of options directly to the employees).

[55] *Amirsaleh*, 2008 WL 4182998, at *4–5.

[56] *Id.* at *4.

[57] *Id.* ("[A]s the United States District Court for the District of Delaware has ruled, former shareholders of a corporation are intended third party beneficiaries where the merger agreement provided that the shareholders would receive compensation for their shares and the merger required shareholder approval." (citing *Hadley*, 2003 WL 21960406, at *5)). The Court further distinguished the *Orban v. Field* case, cited by Defendants here, as involving a "wholly incidental" benefit—the right to a class vote. *Id.* (citing *Orban*, 1993 WL 547187, at *9).

27

his right to elect the form of his consideration under the Merger Agreement"—a "right 'clearly provided by the Agreement.'"[58] The Court reached this conclusion although the merger agreement expressly disclaimed third-party beneficiaries.[59]

Thus, a stockholder's equity stake neither automatically confers nor automatically disqualifies a stockholder from demonstrating third-party beneficiary status to a corporate contract. Plaintiff is eligible for third-party beneficiary status if Plaintiff demonstrates the three required elements, as the plaintiff did in *Armisaleh*.

Turning to the first element, Plaintiff must to demonstrate that the Agreement confers an intended benefit to Plaintiff. As part of this analysis, Plaintiff must show that it received a direct as opposed to an incidental benefit from the Agreement. Third parties who "happen[] to benefit from the performance of the promise either coincidentally or indirectly"—*i.e.*, incidental beneficiaries—"will be held to have no enforceable rights under the contract."[60] "[A] benefit need not be pecuniary to

---

[58] *Amirsaleh*, 2008 WL 4182998, at *5.

[59] *Id.*

[60] *Insituform*, 534 A.2d at 269 (citations omitted); *see also Comrie*, 2004 WL 293337, at *4 ("Where the effect on a third party, 'while a benefit to [that party] and intended, [is] merely a means through which the benefit that motivated the contract was sought to be achieved for the signatories,' even if that third party is not merely incidental to the contract, that third party takes no rights under the contract." (alterations in original) (citation omitted)).

constitute a direct benefit."[61]     To determine whether the Amended Stockholder

Agreement confers a direct benefit to Plaintiff, the Court looks to the terms of the

contract.[62]

The terms of the Agreement adopt in modified form the protections of Section

203.  As reflected in its recitals, the Agreement adopts the intent of the original

stockholder agreement, which was entered into "in connection with and as a

condition to Delek receiving approval for purposes of Section 203[.]"[63]  And the

terms of the Agreement mimic Section 203's anti-takeover protections by preventing

Delek from entering into transactions with Alon.[64]

---

[61] *Baker v. Impact Hldg., Inc.*, 2010 WL 1931032, at *4 (Del. Ch. May 13, 2010) (finding that a stockholders agreement conferring a board seat to a third party provided a direct benefit to that third party).

[62] *See Comrie*, 2004 WL 293337, at *3 (finding contracting party's intent to bestow rights on third parties was "plain from the face of the Agreement" where the agreement directed the grant of benefits to the third parties); *Hadley*, 2003 WL 21960406, at *5 (citing *Grant St. Artists v. Gen. Elec. Co.*, 19 F. Supp. 2d 242, 253 (D.N.J. 1998)).

[63] Am. S'holder Agr. at 1 (second "WHEREAS" clause); *see also id.* Ex. B ("subject to and contingent upon Delek and the Company entering into the Stockholder Agreement, any acquisition of 'ownership' of 'voting stock' . . . of the Company by Delek or its Affiliates resulting solely by reason of the Stock Purchase Transaction . . . is hereby approved, so that the restrictions on business combinations contained in Section 203 will not apply to Delek or its Affiliates and Associates solely as a result of the Stock Purchase Transaction").

[64]  *Compare* 8 *Del. C.* § 203(a) ("[A] corporation shall not engage in any business combination with any interested stockholder for a period of 3 years following the time that such stockholder became an interested stockholder" unless certain conditions are present.), *with* Am. S'holders Agr. § 1.01(a) ("Delek covenants and agrees that Delek shall not . . . own, acquire, offer or propose to acquire, or agree or seek to acquire, or solicit the acquisition of, by purchase or otherwise, any Company Capital Stock or equity-linked securities . . . if, following such acquisition or due to such ownership, Delek . . . would own

Section 203 protections directly benefit stockholders of a Delaware corporation. Like all provisions of the Delaware General Corporation Law, Section 203 is part of a contract between Delaware corporations and their stockholders and thus provides enforceable benefits to those stockholders.[65] The current version of Section 203, in substantial part, was approved and became effective in 1988, in the wake of the United States Supreme Court upholding as constitutional, in *CTS Corp. v. Dynamics Corp. of America*, an Indiana act created for the "primary purpose" of "protect[ing] the shareholders of Indiana corporations" against hostile corporate

---

Company Capital Stock in excess of the Threshold Amount."), *and id.* § 1.05(h) (Other than as permitted in certain sections, "Delek shall not . . . enter into or agree, offer, publicly propose or seek to enter into, or otherwise be involved in or part of, any acquisition transaction, merger or other business combination relating to all or part of the Company or any of its Subsidiaries or any acquisition transaction for all or part of the assets of the Company or any of its Subsidiaries or any of their respective businesses."), *and id.* § 2.02(a) ("[T]he parties agree that, until the first anniversary of the Closing, any material transaction between the Company or its Subsidiaries, on the one hand, and Delek . . . , on the other hand, and any action or transaction relating to this Agreement shall not be taken without prior Independent Director Approval or Unaffiliated Stockholder Approval.").

[65] *See In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1050 (Del. Ch. 2015) ("Stockholders similarly can sue directly to enforce contractual constraints on a board's authority under the charter, bylaws, and provisions of the DGCL. The availability of a direct cause of action in these situations comports with the Delaware Supreme Court's longstanding recognition that the DGCL, the certificate of incorporation, and the bylaws together constitute a multi-party contract among the directors, officers, and stockholders of the corporation. As parties to the contract, stockholders can enforce it." (internal footnotes omitted)); *see also Espinoza v. Zuckerberg*, 124 A.3d 47, 65 (Del. Ch. 2015) ("Although minority stockholders have no power to alter a controlling stockholder's binding decisions absent a fiduciary breach, they are entitled to the benefits of the formalities imposed by the DGCL[.]"); *Fed. United Corp. v. Havender*, 11 A.2d 331, 333 (Del. 1940) ("It is elementary that [the DGCL] provisions are written into every corporate charter.").

takeovers.[66] Similar to the Indiana act, the stated purpose of Section 203 is to confer a benefit to stockholders by striking "a balance between the benefits of an unfettered market for corporate shares and the well documented and judicially recognized need to limit abusive takeover tactics" and to "encourage a full and fair offer."[67]

In sum, the Agreement adopts the protections of Section 203, and the protections of Section 203 directly benefit stockholders. It follows that the Agreement provides direct benefits to stockholders. Further, Plaintiff was an Alon stockholder; thus, Plaintiff received direct benefits from the Agreement.

It is reasonable to infer that direct benefits conferred to Plaintiff by the Agreement were intended. "To determine whether the parties intended to make an individual a third-party beneficiary, the Court must look to the terms of the contract and the surrounding circumstances."[68] Here, the terms and the surrounding circumstances of the Agreement reflect that the Agreement was entered into to replicate aspects of Section 203's protections. The benefits of those protections to Plaintiff, therefore, were not mere coincidence; they were clearly intended.

---

[66] 481 U.S. 69, 91 (1987).

[67] 2 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations & Business Organizations* § 203, at VI-31 (3d ed. 2019) (Comment to Section 203 effective Feb. 2, 1988).

[68] *Hadley*, 2003 WL 21960406, at *5.

31

Turning to the second element, it is reasonable to infer that the benefits conferred by the Agreement were intended to satisfy pre-existing legal obligations—those provided by Section 203—and are otherwise a gift.

Turning to the third element, the anti-takeover protections in the Agreement are a material part of its purpose. The provisions at issue in this lawsuit appear in prominently in the first two sections of the Agreement. The recitals of the Agreement reflect as its purpose Alon's desire to impose conditions to Delek's future stock purchases. The contract generally reflects an intent to steer any Delek offer to the Alon Board to avoid a creeping takeover deleterious to stockholder value. Without the anti-takeover provisions, the Agreement would not achieve that purpose.

Because Plaintiff has pled facts sufficient to support all three elements required to achieve third-party beneficiary status, Plaintiff has standing to sue for breach of the Agreement.

### 2. The Complaint adequately alleges that Delek breached the Amended Stockholder Agreement.

The Complaint claims that Delek breached the Standstill Provision, which states that Delek shall not "own, acquire, offer or propose to acquire, or agree or

seek to acquire, or solicit the acquisition of" Alon stock during the Standstill Period.[69]

Defendants contend that the acts proscribed by the Standstill Provision require "affirmative conduct by Delek."[70]  They focus their argument on "offering or proposing to acquire," contending that "offer" means "to present for acceptance or rejection" and "propose" means "to put forward for consideration, discussion, or adoption; suggest."[71]  Defendants further define "seek" as "to endeavor to obtain or reach" and "solicit" as "to seek or obtain by persuasion, entreaty, or formal application[;]"[72] Defendants contend that these verbs all require some affirmative action by Delek.[73]

Even accepting Defendants' position and proffered definitions as accurate for the sake of argument,[74] the Complaint alleges facts sufficient to support a claim for breach of the Standstill Provision.  The Complaint alleges that during the Standstill Period, Delek:

---

[69] Am. S'holder Agr. § 1.01(a).

[70] Delek Defs.' Opening Br. at 19; Delek Defs.' Reply Br. at 4–5.

[71] Delek Defs.' Opening Br. at 19.

[72] *Id.* at 19–20.

[73] Delek Defs.' Reply Br. at 4–5.

[74] The Court faced a similar standstill provision in *In re TD Banknorth Stockholders Litigation*, where it adopted an arguably broader definition of propose:  "to form a purpose or intention, or to offer up a plan or scheme."  938 A.2d 654, 665 (Del Ch. 2007).

- Publicly announced its intent to acquire Alon;[75]

- Entered into a confidentiality agreement to permit the exchange of non-public information;[76]

- Met with Wiessman six times and over the course of several months to negotiate substantive terms of the merger prior to the expiration of the Standstill Period;[77] and

- Suggested several terms, including a stock-for-stock merger structure and "an exchange ratio reflecting a discount to current Alon market price."[78]

These are all affirmative actions. And considering these allegations as a whole, it is reasonably conceivable that Delek was seeking to acquire Alon during the Standstill Period.

The finding that Plaintiff has adequately alleged a breach of the Standstill Provision has a domino effect in this analysis, because the other provisions at issue parrot the verbiage and encompass the actions prohibited by the Standstill Provision.

The No Merger Provision states that Delek shall not during the Standstill Period "offer . . . or seek to enter into, or otherwise be involved in or part of, any acquisition transaction, merger or other business combination relating to all or part

---

[75] Second Am. Compl. ¶¶ 59, 72.

[76] *Id.* ¶ 68.

[77] *See id.* ¶ 62 (Oct. 30, 2015 meeting); *id.* ¶ 66 (Dec. 15, 2015 meeting); *id.* ¶ 70 (Dec. 31, 2015 meeting); *id.* ¶ 74 (Jan. 27, 2016 meeting); *id.* ¶ 86 (mid-February 2016 meeting); *id.* ¶ 89 (Mar. 22, 2016 meeting).

[78] *Id.* ¶¶ 62, 66, 74, 86, 89, 96.

of the Company . . . ."[79]  The actions prohibited by the No Merger Provision encompass the actions prohibited by the Standstill Provision, as seeking to acquiring stock is an acquisition transaction "relating to" Alon.[80]  Because Plaintiff has pled facts sufficient to support a claim for breach of the Standstill Provision, Plaintiff has adequately alleged a breach of the No Merger Provision.[81]

The No Material Transactions Provision states that Delek shall not take or enter into "any action or transaction relating to this [Amended Stockholder] Agreement" during the Standstill Period "without prior Independent Director Approval or Unaffiliated Stockholder Approval."[82]  It is undisputed that Alon never formed an Independent Director Committee, which is required under the Agreement to obtain Independent Director Approval.[83]  It is also undisputed that Alon never obtained Unaffiliated Stockholder Approval.  Thus, the Complaint states a claim that

---

[79] Am. S'holder Agr. § 1.05(h).

[80] *Medtronic Vascular, Inc. v. NanoMedSystems, Inc.*, 2014 WL 795077, at *1 (Del. Ch. Jan. 27, 2014) (recognizing that the contractual term "related to" has a "broad scope"); *Pharm. Prod. Dev., Inc. v. TVM Life Sci. Ventures VI, L.P.*, 2011 WL 549163, at *5 (Del. Ch. Feb. 16, 2011) ("[O]ur courts have considered the connector 'relating to' to be 'paradigmatically broad[.]'").

[81] The Complaint also states a claim that Delek breached the No Circumvention Provision, which states that Delek shall not "take any action intended to circumvent" the No Merger Provision.  Am. S'holder Agr. § 1.05(k).

[82] Am. S'holder Agr. § 2.02(a).

[83] *See* Delek Defs.' Opening Br. at 22 n.10; Delek Defs.' Reply Br. at 10.

Delek breached the No Material Transactions Provision if it adequately alleges that Delek took actions for which approval is required.

Like the No Merger Provision, the No Material Transactions Provision's prohibition on Delek taking "any action . . . relating to this Agreement" without approval must be read to prohibit Delek from taking actions prohibited by the Standstill Provision—an action plainly "relating to" the Agreement.[84] Thus, a violation of the Standstill Provision also violates the No Material Transactions Provision. Because the former is well pled, so too is the latter.[85]

### 3. The Complaint adequately alleges damages.

Delek argues that Count I must be dismissed, even if it is reasonably conceivable that Delek violated its contractual obligations, because the Complaint fails to adequately allege damages. The Court disagrees. At the pleadings stage, it is sufficient for the Complaint to aver damages resulting from the alleged contractual breaches generally.[86] And the Complaint has met this standard.

---

[84] *See supra* n.80.

[85] Delek's entry into the First Amendment to the Amended Stockholder Agreement also breached the No Material Transactions Provision, as such an agreement certainly "relates to" the Amended Stockholder Agreement and was thus subject to the approval requirements. *See* Am. S'holder Agr. § 4.

[86] *See, e.g.*, *In re Ezcorp Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *30 (Del. Ch. Jan. 25, 2016) ("Allegations regarding damages can be pled generally."). To argue that Plaintiff's damages allegations are inadequate and should result in dismissal, Defendants cite *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129 (Del. Ch. 2003). Delek Defs.' Opening Br. at 25. In that case, the Court applied a particularity standard to a motion to dismiss the plaintiff's fraudulent inducement claim (which it denied), but not to the

36

As Defendants acknowledge, the Complaint alleges that Delek's breaches of the Amended Stockholder Agreement "resulted in Delek acquiring the shares of the Alon stockholders [in July 2017] on terms far less favorable to Alon stockholders than if the terms of the [Agreement] had been honored."[87] Even beyond this general allegation, the Complaint alleges facts supporting an inference that Delek's alleged breaches, including its public statements, depressed Alon's stock price, thereby manufacturing more favorable market conditions for Delek in the July 2017 merger.[88] These allegations are sufficient to plead damages resulting from Delek's alleged contractual breaches.

### 4. The Complaint fails to state a claim for breach of the Amended Stockholder Agreement against the Director Defendants.

Count I fails to state a claim as to the Director Defendants because they are not parties to the Agreement. "It is a general principle of contract law that only a party to a contract may be sued for breach of that contract."[89] Here, only Alon and

---

contract claim. *See* 832 A.2d at 143–46 & n.28 ("The defendants have also claimed that Wexford has not adequately pleaded damages for the purported breach, however, based on the facts that Wexford has alleged, it can reasonably be inferred that, if those facts are true, Wexford suffered damages in the form of an overpayment for its investment in Encorp.").

[87] Delek Defs.' Reply Br. at 13 (quoting Second Am. Compl. ¶ 182).

[88] *See* Second Am. Compl. ¶¶ 13, 60, 94, 98.

[89] *Wallace ex rel. Cencom Cable Income P'rs II, L.P. v. Wood*, 752 A.2d 1175, 1180 (Del. Ch. 1999) (citation omitted); *see also Huff Energy Fund, L.P. v. Gershen*, 2016 WL 5462958, at *7–8 (Del. Ch. Sept. 29, 2016) (holding that directors who signed shareholders agreement in a representative capacity could not be held liable for breach of the agreement). While a non-party to a contract generally cannot *be sued* for breach of the

Delek are parties to the Agreement.[90] The Director Defendants are not personally obligated to perform under the Agreement and, absent rare circumstances not pled here, cannot be held liable for breach of the Agreement.[91] Count I is dismissed as to the Director Defendants.[92]

## B. Violation of Section 203 and Conversion

Count II asserts that Delek, Holdco, and Alon violated Section 203 by entering into the merger. Count III asserts that because Section 203 prohibited the merger, the merger was void *ab initio* and thus constituted an act of conversion.

---

contract, as discussed above, the law recognizes that an intended third-party beneficiary of a contract may have standing *to sue* for breach of the contract.

[90] Am. S'holder Agr. at pp. 1, 39.

[91] *See Huff Energy*, 2016 WL 5462958, at *7–8 ("The Director Defendants were not personally obligated to perform under the contract and cannot be held liable for breach of the contract."). Indeed, Plaintiff concedes that the Director Defendants cannot be personally liable for breaches of the Amended Stockholder Agreement. Pl.'s Ans. Br. at 25–26 n.30. Plaintiff nevertheless asserts that the Director Defendants should be joined as parties to the breach of contract claim. According to Plaintiff, the Director Defendants, as the persons through whom Delek and Alon can act to fulfill the Amended Stockholder Agreement, are necessary to any equitable relief this Court awards against Delek and Alon. This argument fails. This Court can award equitable relief against a company without the company's directors being parties to the litigation. *See, e.g.*, *QC Hldgs., Inc. v. Allconnect, Inc.*, 2018 WL 4091721, at *11 (Del. Ch. Aug. 28, 2018) (awarding "specific performance compelling the Company to use the Escrow Agreement to fulfill its obligations under the Put Agreement" where the company's directors were not joined as parties).

[92] Defendants do not include in their briefing any argument on Count I as pled against Alon and Holdco. This failure waives Defendants' motion for dismissal as to Count I as pled against Alon and Holdco. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

Plaintiff predicates Counts II and III on the notion that Section 203 applied to the merger despite the Board's Section 203 approval. As its primary argument for why Section 203 applies, Plaintiff contends that by violating the Amended Stockholder Agreement, Delek vitiated Alon's Section 203 approval, and thereby restored Section 203's protections. This creative argument takes many logical leaps, which might not ultimately land. At the pleadings stage, however, the claims survive, solely because the remedy for any breach of the Amended Stockholder Agreement is not a pleadings-stage determination.

Defendants offer a silver bullet to Counts II and III. Section 203(a)(3) permits a board and disinterested stockholders to approve by a two-thirds vote transactions otherwise prohibited by Section 203.[93] Both Alon's Board and roughly 89% of the Alon stockholders approved the merger.[94] Thus, Defendants say that even if Section 203 applies to the merger, the satisfaction of Section 203(a)(3)'s requirements warrants dismissal of Counts II and III. Yet, "[f]or stockholder approval of any

---

[93] 8 *Del. C.* § 203(a)(3). *See generally* Craig B. Smith & Clark W. Furlow, *Guide to Takeover Law of Delaware*, 28–32 (BNA Corporate Practice Series 1988) (discussing 8 *Del. C.* § 203(a)(3)).

[94] The Court may consider the stockholder vote at the pleadings stage. *In re TIBCO Software Inc. S'holders Litig.*, 2015 WL 6155894, at *22 n.90 (Del. Ch. Oct. 20, 2015) ("The Court may take judicial notice of the results of the vote reported in . . . SEC filings because they are not reasonably subject to dispute.").

corporate action to be valid, the vote of the stockholders must be fully informed."[95]

Because Plaintiff has adequately alleged that the stockholder vote was not fully informed as discussed below, Defendants cannot argue that the stockholder vote results in dismissal of Plaintiff's Section 203 claims.

## C. Breach of Fiduciary Duty Against Delek and the Director Defendants[96]

Counts IV and V respectively assert that by approving the merger, Delek breached its fiduciary duties as a controlling stockholder and the individual defendants breached their fiduciary duties as directors. Plaintiff contends that Delek's position as a controlling stockholder standing on both sides of the merger subjects the merger to the entire fairness standard of review, and that the possibility that the entire fairness standard may apply is sufficient to defeat a motion to dismiss.

Defendants' fourfold response is: (1) The Complaint does not adequately allege that Delek was a controlling stockholder. (2) Even if the Complaint supports a finding that Delek was a controlling stockholder, Defendants sufficiently restored the business judgment standard by invoking the *MFW* conditions.[97] (3) Even if the

---

[95] *In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 999 (Del. Ch. 2014) (citing *Citron v. E.I. Du Pont de Nemours & Co.*, 584 A.2d 490, 502–03 (Del. Ch. 1990)), *aff'd sub nom. Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304 (Del. 2015).

[96] Count IV is also asserted against Holdco, but the Complaint pleads no facts from which it can be understood how Plaintiff contends Holdco, the entity into which Alon and later Delek were merged, owed fiduciary duties to Alon's stockholders or breached them.

[97] *See supra* n.1.

40

entire fairness standard applies, the Complaint fails to allege facts sufficient to support a finding of unfair process or unfair price. (4) The Complaint fails to state a non-exculpated claim for breach against the Director Defendants in all events.

### 1. It is reasonably conceivable that Delek exercised control over Alon.

"Entire fairness, Delaware's most onerous standard" of review, arises when the board labors under actual conflicts of interest,[98] such as when a controlling stockholder stands on both sides of a challenged transaction.[99]

Although a majority stockholder is a controlling stockholder as a matter of law,[100] a minority stockholder can also be deemed a controller.[101] Under Delaware law, a plaintiff can demonstrate that a minority stockholder exercised *de facto* control by showing that: (a) the stockholder "actually dominated and controlled the majority of the board generally";[102] or (b) the stockholder "actually dominated and

---

[98] *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 44 (Del. Ch. Aug. 16, 2013); *see also Reiss v. Hazelett Strip Casting Corp.*, 28 A.3d 442, 460 (Del. Ch. 2011).

[99] *Kahn v. Tremont Corp.*, 694 A.2d 422, 428 (Del. 1997); *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1115 (Del. 1994); *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983).

[100] *See, e.g.*, *Lynch*, 638 A.2d at 1113 (observing that a stockholder becomes a fiduciary if it "owns a majority interest in . . . the corporation" (internal quotation marks omitted)).

[101] *See id.* (observing that a stockholder becomes a fiduciary if it "*exercises control* over the business affairs of the corporation" (emphasis original)).

[102] *In re Tesla Motors, Inc. S'holder Litig.*, 2018 WL 1560293, at *13 (Del. Ch. Mar. 28, 2018); *In re Rouse Props., Inc.*, 2018 WL 1226015, at *12 (Del. Ch. Mar. 9, 2018) (first citing *Sciabacucchi v. Liberty Broadband Corp.*, 2017 WL 2325152, at *17 (Del. Ch. May 31, 2017); then citing *In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 531 (Del. Ch. 2003), and then citing *Lynch*, 638 A.2d at 1114–15; *see In re Primedia Inc. Deriv. Litig.*,

41

controlled the corporation, its board or the deciding committee with respect to the challenged transaction."[103] "[T]he question of whether a large block holder is so powerful as to have obtained the status of a 'controlling stockholder' is intensely factual, [and] is a difficult one to resolve on the pleadings."[104]

Plaintiff contends that Delek exercised actual control over Alon prior to the merger.[105] In support, Plaintiff alleges: "Delek owned approximately 48% of Alon's outstanding common stock."[106] Five of Alon's eleven directors at the time of the merger were directly affiliated with Delek.[107] And one of the remaining six directors, Wiessman, was beholden to and therefore lacked independence from Delek. As to Wiessman, Plaintiff specifically alleges that "Wiessman was beholden

---

910 A.2d 248, 257 (Del. Ch. 2006) ("[T]he plaintiffs need not demonstrate that [the alleged controller] oversaw the day-to-day operations of Primedia. Allegations of control over the particular transaction at issue are enough.").

[103] *Cysive*, 836 A.2d at 550–51; *see also Rouse*, 2018 WL 1226015, at *12 (citing *Williamson*, 2006 WL 1586375, at *4); *Tesla*, 2018 WL 1560293, at *13; *Basho Techs. Holdco B, LLC v. Georgetown Basho Inv'rs, LLC*, 2018 WL 3326693, at *27 (Del. Ch. July 6, 2018) ("Broader indicia of effective control also play a role in evaluating whether a defendant exercised actual control over a decision. Examples of broader indicia include ownership of a significant equity stake (albeit less than a majority), the right to designate directors (albeit less than a majority), decisional rules in governing documents that enhance the power of minority stockholder or board-level position, and the ability to exercise outsized influence in the board room, such as through high-status roles like CEO, Chairman, or founder." (footnotes omitted)).

[104] *Tesla*, 2018 WL 1560293, at *13–14 (citation omitted) (concluding that the facts alleged supported a reasonable inference that 22.1% stockholder exercised *de facto* control).

[105] Second Am. Compl. ¶ 133.

[106] *Id.*

[107] *Id.* ("Five of Alon's eleven directors were Delek executives[.]").

42

to Delek" because, among other things, Wiessman, as the CEO and stockholder of the owner of approximately 50% of Alon Israel, benefitted from Delek's purchase of Alon Israel's Alon stock at a time when Wiessman's business interests were "crumbling."[108] Wiessman and his daughter received salaries from Alon and an indirect subsidiary of Alon, thereby indirectly benefitting from Delek's status as Alon's controlling stockholder.[109] And after the merger, Wiessman was appointed to Holdco's board of directors and allowed to continue on as the Executive Chairman of Alon Partners GP.[110]

The allegations concerning Wiessman, coupled with Wiessman's actions during the process leading up to the merger, are sufficient to cast doubt on Wiessman's independence from Delek at the pleadings stage. But even if Wiessman were independent from Delek, it is reasonably conceivable that Delek exercised actual control over Alon. The Complaint alleges facts from which it can be reasonably inferred that Delek dominated Alon's corporate affairs. Specifically, the Complaint alleges that Delek: exercised its influence to remove and replace two directors of the Board in order to work the same change upon the composition of the

---

[108] *Id.* ¶ 26; *see also id.* ¶ 33.

[109] *Id.* ¶ 26.

[110] *Id.*

43

Special Committee;[111] dictated the timing, structure, and price of the merger;[112] and effectively muzzled the Special Committee's public statements to serve Delek's interests.[113]

This finding of reasonable conceivability as to Delek's actual control over Alon comports with the holding of *Kahn v. Lynch Communication Systems*, in which the Delaware Supreme Court affirmed a post-trial holding that a 43.3% stockholder that had designated five of eleven directors was a controlling stockholder.[114] The Supreme Court based this affirmance on the Court of Chancery's "factual finding that 'the . . . [board's independent] directors deferred to [the 43.3% stockholder on a corporate decision] because of its position as a significant stockholder and not because they decided in the exercise of their own business judgment that [the 43.3% stockholder's] position was correct.'"[115]

For these reasons, it is reasonably conceivable that Delek is a controlling stockholder, and the entire fairness standard of review therefore presumptively applies to the approval of the merger.[116]

---

[111] Second Am. Compl. ¶¶ 75–78.

[112] *Id.* ¶¶ 105, 110, 114, 118–20, 136, 142, 145.

[113] *Id.* ¶ 106.

[114] 638 A.2d at 1111.

[115] *Id.* at 1115.

[116] As an alternative basis for applying entire fairness, Plaintiff contends that the majority of the Board lacked independence from Delek or was interested in the merger. Pl.'s Ans. Br. at 41, 45–49. Defendants contend that Plaintiff's allegations do not support a finding

44

## 2. It is reasonably conceivable that the business judgment standard was not restored under *MFW*.

Under *MFW*, in controller buyouts, the business judgment standard of review will be restored where "the controller conditions the procession of the transaction on the approval of both a Special Committee and a majority of the minority stockholders."[117] Additional conditions must be met to restore the business judgment standard under *MFW*,[118] but Defendants' dismissal argument stands and falls on this requirement.

For the business judgment standard to apply under *MFW*, Delek needed to have invoked the *MFW* conditions "ab initio" or at the outset of the process.[119] According to Defendants, *MFW* was properly invoked because the Special Committee's first formal offer and Delek's first formal counteroffer conditioned the merger on Special Committee approval and a majority-of-the-minority vote.[120]

---

that the majority of the Board is conflicted. Delek Defs.' Reply Br. at 27–30. Because this decision concludes that Count IV adequately states a claim for breach of fiduciary duty under a controlling stockholder theory, I do not address Plaintiff's alternative basis for invoking entire fairness or Defendants' response to that alternative argument.

[117] *MFW*, 88 A.3d at 645.

[118] *Id.* (a proponent must demonstrate that "(i) the controller conditions the procession of the transaction on the approval of both a Special Committee and a majority of the minority stockholders; (ii) the Special Committee is independent; (iii) the Special Committee is empowered to freely select its own advisors and to say no definitively; (iv) the Special Committee meets its duty of care in negotiating a fair price; (v) the vote of the minority is informed; and (vi) there is no coercion of the minority").

[119] *Id.* at 642.

[120] Delek Defs.' Reply Br. at 35–36 (citing Second Am. Compl. ¶¶ 11, 90, 124). Delek also claims that "Plaintiff . . . admits that the very first offer that was made in connection

45

Defendants' argument is inconsistent with recent Delaware Supreme Court cases clarifying the timing requirements of *MFW*—*Flood v. Synutra International, Inc.*[121] and *Olenik v. Lodzinski*.[122]

In *Synutra*, the board considered a preliminary proposal that "did not condition a potential transaction on both a favorable committee recommendation and approval by a majority of the disinterested stockholders."[123] Before the board had substantively evaluated the proposal, however, the bidder sent a follow-up letter reaffirming its initial offer and "expressly condition[ing] the transaction on the approval of the Special Committee and a majority of the minority stockholders."[124] The Court of Chancery held that this timing sufficed to invoke the *MFW* protections.[125] The Delaware Supreme Court affirmed the trial court's holding,

with the Transaction was authorized by the Special Committee and was explicitly conditioned on majority-of-the-minority approval." Delek Defs.' Opening Br. at 41 (citing Proxy at 89–91). Plaintiff neither authored the Proxy nor made any such admission. In addition, a proxy cannot be offered on a motion to dismiss for the truth of the matters set forth therein. *White v. Panic*, 783 A.2d 543, 547 n.5 (Del. 2001) ("[T]he court may not employ assertions in documents outside the complaint to decide issues of fact against the plaintiff without the benefit of an appropriate factual record.").

[121] 195 A.3d 754 (Del. 2018).

[122] -- A.3d ---, 2019 WL 1497167, at *1 (Del. Apr. 5, 2019).

[123] *Flood v. Synutra Int'l, Inc.*, 2018 WL 705702, at *2 (Del. Ch. Feb. 2, 2018) (ORDER), *aff'd*, 195 A.3d 754 (Del. 2018).

[124] *Id.* at *2.

[125] *Id.* at *3 ("The prompt sending of the Follow-up Letter prevented the Buyer Group from using the *M&F Worldwide* conditions as bargaining chips. . . . The plaintiff has not pled facts sufficient to call into question compliance with the *ab initio* requirement.").

concluding that the timing requirements of *MFW* are satisfied "so long as the controller conditions its offer on the key protections at the germination stage of the Special Committee process, when [the committee] is selecting its advisors, establishing its method of proceeding, beginning its due diligence, and has not commenced substantive economic negotiations with the controller[.]"[126]

In *Olenik*, the Court of Chancery determined that the timing requirements of *MFW* had been satisfied where negotiations commenced between the parties eight months before the controller imposed the *MFW* conditions because those negotiations were merely "exploratory in nature."[127]  The Delaware Supreme Court reversed the holding because the *MFW* requirements "were not put in place early and before substantive economic negotiation took place."[128]  The Court found that "preliminary discussions transitioned to substantive economic negotiations when the parties engaged in a joint exercise to value" the target, months before the *MFW* conditions were imposed.[129]

---

[126] 195 A.3d at 763.

[127] 2018 WL 3493092, at *5, *16 (Del. Ch. July 20, 2018), *aff'd in part, rev'd in part*, 2019 WL 1497167.

[128] 2019 WL 1497167, at *8.

[129] *Id.* at *9.

Applying the guidance of *Synutra* and *Olenik*, Plaintiff has pled facts supporting a reasonable inferenced that Delek engaged in substantive economic negotiations before Delek imposed the *MFW* conditions.

The Special Committee first raised the *MFW* conditions in its April 2016 proposal and Delek effectively agreed to this aspect of the proposal through its October 2016 counteroffer.[130] In the six months prior, Yemin on behalf of Delek met with Wiessman six times to discuss potential deal terms.[131] At the first and second of these meetings, Yemin is alleged to have proposed a "stock-for-stock deal" structure and "an exchange ratio reflecting a discount" to Alon's market price.[132] Wiessman, on behalf of Alon, responded with price and other deal terms, "including no discount to Alon's market price and a $4 per share special dividend."[133] Yemin in turn responded that absent an exchange ratio reflecting "a significant discount to Alon's stock price[,]" a stock-for-stock deal would not be attractive, and suggested a "cash-and-stock" deal.[134] Wiessman reacted to the concept of cash-and-stock deal by stating that the Special Committee would expect

---

[130] *See* Second Am. Compl. ¶¶ 90, 110–12.

[131] *See supra* n.77.

[132] Second Am. Compl. ¶¶ 62, 66.

[133] *Id.* ¶ 67.

[134] *Id.* ¶¶ 74, 86, 89.

a "cash-based premium."[135]  But later, Wiessman rejected the proposed cash-and-stock deal due to tax consequences and again proposed a special dividend.[136]  These negotiations were substantive in nature.  They concerned the deal structure, exchange ratio, and price terms.[137]  Further, before the Special Committee first proposed and Delek purportedly agreed to self-disable, the Special Committee already had engaged J.P. Morgan as its financial advisor and Gibson, Dunn & Crutcher LLP as its legal counsel,[138] and Delek and Alon had "entered into a confidentiality agreement to permit the exchange of non-public information."[139]

Thus, it is reasonably conceivable that the *MFW* conditions were not imposed at the "germination stage," but rather, many months after.  For this reason, Defendants are not entitled to business judgment review at the pleadings stage, and

---

[135] *Id.* ¶ 86.

[136] *Id.* ¶ 89.

[137] The first formal proposal Wiessman delivered on April 1, 2016 sought an all-stock deal, based on an at-the-market exchange ratio of 0.687 Delek shares for each share of Alon common stock.  Second Am. Compl. ¶ 90.  Because Plaintiff alleges that the parties negotiated an exchange ratio for a stock-for-stock transaction and price terms prior to April 1, 2016, a reasonable inference can be drawn that the April 1 formal proposal merely reiterates the terms Wiessman and Yemin already negotiated.  *See Olenik*, 2018 WL 3493092, at *15–16 nn.199, 206 (noting a justified concern could arise on a record where a controller "negotiate[s] the material terms of a transaction before submitting a formal offer, and then claim[s] *ab initio* status by sweeping those terms, along with the *MFW* conditions into its first (and final) formal proposal").

[138] *See* Second Am. Compl. ¶ 56.

[139] *Id.* ¶ 68.

it is reasonably conceivable that the merger will be subject to the entire fairness standard.[140]

### 3. The Complaint adequately alleges unfair process and unfair price.

"The possibility that the entire fairness standard of review may apply tends to preclude the Court from granting a motion to dismiss under Rule 12(b)(6) unless the alleged controlling stockholder is able to show, conclusively, that the challenged transaction was entirely fair based solely on the allegations of the complaint and the documents integral to it."[141]  "The concept of fairness has two basic aspects:  fair dealing and fair price."[142]  Fair dealing addresses "questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained."[143]  Fair price

---

[140] Plaintiff also disputes that the Special Committee was sufficiently independent and effective so as to satisfy the *MFW* standard.  It also disputes that the stockholder vote prevailed by a majority of the truly unaffiliated stockholders.  Pls.' Ans. Br. at 70–72; *id.* at 19 ("The 4,412,582 million shares collectively held by Morris and Wiessman constituted approximately 6.2% of the Company's stock and 11.6% of the non-Delek public shares, giving Delek a substantial head start toward fulfilling the unaffiliated stockholder vote requirement.").  Because this decision determines that the facts alleged support a reasonable inference that Delek failed to invoke the *MFW* protections at the relevant time, this decision does not resolve these other arguments.

[141] *Klein v. H.I.G. Capital, LLC*, 2018 WL 6719717, at *16 (Del. Ch. Dec. 19, 2018). *See also Sciabacucchi v. Liberty Broadband Corp.*, 2018 WL 3599997, at *15 (Del. Ch. July 26, 2018) (applying entire fairness "typically precludes dismissal of a complaint under Rule 12(b)(6)" (citing *Orman v. Cullman*, 794 A.2d 5, 21 n.36 (Del. Ch. 2002))).

[142] *Weinberger*, 457 A.2d at 711.

[143] *Id.*

concerns "the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock."[144]  "A strong record of fair dealing can influence the fair price inquiry, reinforcing the unitary nature of the entire fairness test.  The converse is equally true: process can infect price."[145]

The Complaint pleads facts supporting a reasonable inference that the process leading to the merger was unfair.  According to the Complaint, significant aspects of the merger were negotiated at a time when Delek was contractually precluded from making an offer.[146]  The Special Committee process was suboptimal.  At critical stages, the committee's authority was unclear.  By design, two directors were removed from the Alon Board early in the process and replaced with individuals selected by Delek.[147]  The committee allowed negotiations to be conducted by Wiessman, whose independence and disinterest were questionable.[148]  Further, the

---

[144] *Id.*

[145] *Reis*, 28 A.3d at 467 (citation omitted).  *See also Basho*, 2018 WL 3326693, at *37 ("[A]n unfair process can taint the price." (citations omitted)).

[146] *See, e.g.*, Second Am. Compl. ¶¶ 55, 74.

[147] *Id.* ¶ 78.

[148] *See, e.g.*, *id.*

Complaint contains non-conclusory allegations suggesting that the Special Committee failed to inform itself adequately.[149]

The Complaint also pleads facts supporting a reasonable inference that the merger consideration was unfair. According to the Complaint, the merger price paid failed to capture the "fair intrinsic value" of Alon's stock for multiple reasons.[150] The price was tied to the companies' respective stock values.[151] As a result, any decline in Delek's stock price affected the merger price negatively,[152] and Delek made multiple public statements that had the effect of pushing down the merger price.[153] Furthermore, the merger price was at the "low end of the value ranges for Alon's common stock" reflected in J.P. Morgan's analyses, which are in turn alleged to have undervalued Alon's common stock.[154] For example, the Complaint asserts that one set of projections J.P. Morgan relied upon improperly excluded management's best estimates of the future impact of planned growth projects.[155] And the Complaint alleges that J.P. Morgan's discounted cash flow analyses

---

[149] *See supra* n.30.

[150] Second Am. Compl. ¶ 147. The Complaint alleges that the price "was a substantial discount" to the price originally paid by Delek for Alon Israel's stock two years earlier. *Id.* ¶ 145.

[151] *See id.* ¶¶ 145–46.

[152] *Id.* ¶ 146.

[153] *Id.* ¶¶ 145, 197.

[154] *Id.* ¶ 148.

[155] *Id.* ¶¶ 148–55.

52

"employed an unreasonably low perpetual growth rate for Alon, which exerted additional downward pressure on the resulting valuations."[156]   Finally, the Complaint alleges that the price failed to reflect the value of the planned acquisition of the Partnership interests as well as the value of the Partnership's market capitalization, and certain Alon assets.[157]

Given these alleged problems, it is reasonably conceivable that Delek and the Director Defendants did not engage in a fair process or negotiate a fair price for Plaintiff and the class, and thereby breached their fiduciary duties.

### 4.    The Complaint states a claim for breach of fiduciary duties against the Director Defendants.

Defendants contend that the "fiduciary duty claims against the Delek Directors must . . . be dismissed because they recused themselves as directors of Alon from the Special Committee's and Board's process of approving" the merger.[158]   In support of this argument, Defendants appear to rely on the Proxy's statement that the Delek Defendants recused themselves from the adoption of Board resolutions approving and recommending the merger.[159]   Leaving aside that this argument finds no basis in the Complaint, merely recusing oneself from the ultimate

---

[156] *Id.* ¶ 156.

[157] *Id.* ¶¶ 157–59.

[158] Delek Defs.' Opening Br. at 32 n.14.  In support of this argument,

[159] *See, e.g.*, Proxy at 118.

decision does not absolve a director of his or her fiduciary duties.[160] Here, the Complaint alleges facts from which it can be reasonably inferred that the Delek Defendants participated in the process leading to and the approval of the merger.[161] Defendants' recusal argument fails.

Relying on the exculpatory provision contained in Alon's charter, the Special Committee Defendants contend that the Complaint has failed to allege a non-exculpated claim against them.[162] They argue that the Complaint states only "conclusory criticisms of the Special Committee process" that do not demonstrate that the Special Committee acted in bad faith.[163] The Special Committee Defendnats make a good point, and the allegations against the committee members aside from Wiessman are not extensive. Still, based on the above-discussed deficiencies in the

---

[160] In support of their recusal argument, the Delek Defendants rely on *In re Tri-Star Pictures, Inc. Litigation*, 1995 WL 106520 (Del. Ch. 9, 1995) and *Citron v. E.I. Du Pont de Nemours & Co.*, 584 A.2d 490 (Del. Ch. 1990). In both of these cases, however, the directors found to have not breached their fiduciary duties had played no role in the board's decision-making *process*; they had not merely recused themselves from the ultimate decision rendered. 1995 WL 106520, at *3–4; 584 A.2d at 499. Indeed, the Court in *Tri-Star* expressly noted that there is "no *per se* rule [that] unqualifiedly and categorically relieves a director from liability *solely* because that director refrains from voting on the challenged transaction." 1995 WL 106520, at *3. In so opining, the Court contemplated "a scenario in which certain members of the board of directors conspire with others to formulate a transaction that is later claimed to be wrongful. . . [and] those directors then deliberately absent themselves from the directors' meeting at which the proposal is to be voted upon, specifically to shield themselves from any exposure to liability." *Id.*

[161] *See, e.g.*, Second Am. Compl. ¶ 92, 116, 120, 134.

[162] *See* Special Comm. Defs.' Opening Br. at 17–18.

[163] *Id.* at 17–20 (characterizing the Complaint's allegations as "nitpicking").

54

Special Committee's process and issues concerning the merger price, and the below-discussed disclosure violations, it is reasonably conceivable that the Special Committee Defendants acted in bad faith. The Complaint therefore states a breach of fiduciary duty of loyalty claim against the Special Committee Defendants as well as the other Director Defendants in connection with the merger.

### D.    Disclosure Claims[164]

Through Count V, Plaintiff alleges that the Director Defendants breached their fiduciary duties due to material misstatements and omissions in the Proxy and June 21 8-K.[165]

"[D]irectors of a Delaware corporation have a fiduciary duty to disclose fully and fairly all material information . . . ."[166] "Under Delaware law, when a board chooses to disclose a course of events or to discuss a specific subject, it has long been understood that it cannot do so in a materially misleading way, by disclosing

---

[164] Through Count IV, the Complaint asserts that Delek also breached its fiduciary duties due to material deficiencies and omissions in Alon's Proxy. Second Am. Compl. ¶ 198. Plaintiff does not brief its disclosure claims as pled against Delek; this aspect of Plaintiff's Count IV is therefore dismissed. *Forsythe v. ESC Fund Mgmt. Co. (U.S.), Inc.*, 2007 WL 2982247, at *11 (Del. Ch. Oct. 9, 2007) ("The plaintiffs have waived these claims by failing to brief them in their opposition to the motion to dismiss.").

[165] Second Am. Compl. ¶¶ 210–11. Count V also alleges that the Director Defendants breached their fiduciary duties by failing to enforce the Amended Stockholder Agreement and violating Section 203. Second Am. Compl. ¶ 203. Defendants did not brief this aspect of Count V, and Defendants' motion to dismiss this portion of Count V is therefore waived. *See Emerald P'rs*, 726 A.2d at 1224 ("Issues not briefed are deemed waived.").

[166] *Appel v. Berkman*, 180 A.3d 1055, 1060 (Del. 2018) (alteration in original) (citation omitted).

only part of the story, and leaving the reader with a distorted impression."[167] "Disclosures must 'provide a balanced, truthful account of all matters they disclose.' Partial disclosure, in which some material facts are not disclosed or are presented in an ambiguous, incomplete, or misleading manner, is not sufficient to meet a fiduciary's disclosure obligations."[168] "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."[169] "Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[170]

Plaintiff identifies seven categories of allegedly deficient disclosures. Six of these categories hit the mark.

### 1. The stockholder agreement, the Amended Stockholder Agreement, and the amendment to the Amended Stockholder Agreement

The Proxy discloses the existence of the original stockholder agreement, the Amended Stockholder Agreement, and the amendment to the Amended Stockholder

---

[167] *Id.* at 1064.

[168] *Id.* (footnote omitted).

[169] *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

[170] *Id.* (quoting *TSC Indus.*, 426 U.S. at 449).

56

Agreement. Neither the Proxy nor June 21 8-K describe the terms of the original stockholder agreement.[171] As for the Amended Stockholder Agreement, the Proxy states that it included "a 'standstill' provision prohibiting Delek from acquiring additional shares that would result in Delek owning more than 49.99% of the outstanding Alon common stock" before the end of the Standstill Period.[172] The Proxy does not disclose that Delek was prohibited from taking a host of other broadly described actions, including "seek[ing] to" acquire Alon common stock. The June 21 8-K provides little additional detail.[173] As for the amendment to the Amended Stockholder Agreement, the Proxy states that it permitted the nomination of Wheeler and Kacal as directors.[174]

These disclosures are materially incomplete. The stockholder agreement and its various amendments were put in place to protect stockholders, and a reasonable stockholder would consider it important to have a full and fair description of these agreements in deciding how to vote on the merger.

Defendants note that the Proxy directs stockholders to a May 26, 2015 Schedule 13D attaching a copy of the Amended Stockholder Agreement and a

---

[171] *See generally* Proxy at 82.

[172] *Id.* at 83. The Proxy states, misleadingly, that the Agreement permitted Delek to nominate its own slate of directors for Alon's 2016 annual stockholder meeting. *Id.*

[173] *See generally* June 21 8-K. This 8-K deletes the Proxy's allegedly misleading statement regarding Delek's ability to nominate its own director slate

[174] See Proxy at 87–88.

February 3, 2016 Schedule 13D attaching a copy of the amendment to the Amended Stockholder Agreement. Disclosures are not supposed to take the form of a scavenger hunt. Including directions of where to find copies of some, but not all, of the relevant agreements did not satisfy the Director Defendants' disclosure obligations.[175]

## 2. J.P. Morgan's conflict of interests

The Proxy discloses that J.P. Morgan and its affiliates, in the ordinary course of their businesses, "may actively trade the debt and equity securities or financial instruments . . . of Alon or Delek for their own accounts or for the accounts of their customers . . . ."[176] Plaintiff contends that the language "*may* actively trade . . . equity securities" is materially misleading given that J.P. Morgan *actually* increased its position in Delek by almost 60% while providing financial advice to the Special

---

[175] *See ODS Techs., L.P. v. Marshall*, 832 A.2d 1254, 1262 (Del. Ch. 2003) ("[A]lthough those agreements are disclosed in the Form 10-KSB, the portions of those agreements relevant to a reasonable shareholder are neither highlighted nor mentioned directly in connection with the Amendments."); *see also In re Ebix, Inc. S'holder Litig.*, 2014 WL 3696655, at *10 (Del. Ch. July 24, 2014) ("Discovering the alleged harm would have required a careful and close reading of multiple SEC filings and incorporated exhibits by a stockholder strongly suspicious of the Board's disclosures. The Court cannot say, at the pleading stage, that such effort is required of a reasonably diligent stockholder for laches purposes.").

[176] Proxy at 151. Annex F to the Proxy further discloses that J.P. Morgan and its affiliates "hold on a proprietary basis, less than 1% of the outstanding common stock of each of" Alon and Delek. Proxy, Annex F at 2–3.

Committee during merger negotiations.[177] In deciding how to vote on the merger, a reasonable stockholder would consider it important that the Special Committee's financial advisor increased its stake in the acquirer significantly while advising in negotiations against the acquirer.

### 3. The Board's formation of the Special Committee

The Proxy discloses that "the Special Committee had been operating on the understanding that the Alon Board had established the Special Committee at its meeting on July 31, 2015," but that later "questions arose among the Alon Board members regarding the establishment of the Special Committee."[178] The Proxy further discloses that "the Alon Board formally approved the formation of the Special Committee and the authority of the Special Committee to engage financial and legal advisers" on October 30, 2015.[179] The Proxy also discloses that "on October 27, 2016, the Alon Board adopted resolutions delineating the power and authority of the Special Committee, including the power to decline any proposal from Delek and to review and evaluate strategic alternatives[.]"[180]

---

[177] Pl.'s Ans. Br. at 58 (emphasis added); *see also* Second Am. Compl. ¶ 141 ("JP Morgan increased its Delek position by almost 60% between August 8, 2016 and November 4, 2016[.]").

[178] Proxy at 84.

[179] *Id.*

[180] *Id.* at 108.

These partial disclosures raise more queries than they answer. Any reasonable stockholder reading these statements would consider it important to know: What "questions" were raised at the October 30, 2015 meeting, who raised them, and were they resolved? Any reasonable stockholder would also consider it important to know whether the Special Committee understood the scope of its authority before the Board adopted resolutions on October 27, 2016. The partial nature of the disclosures on this issue create an ambiguous and potentially misleading narrative and are insufficient to meet the Director Defendants' fiduciary obligations.

### 4.     Delek's nomination of Kacal and Wheeler to the Board

The Proxy discloses that on January 27, 2016, Yemin proposed that "the current Alon Board largely be renominated, with two new independent directors replacing two of the current members of the Alon Board at such time."[181] The Proxy further discloses that in February 2015, Wiessman and Yemin discussed replacing Morris, an Alon employee, "[i]n an effort to ensure compliance with . . . NYSE listing standards."[182] Still further, the Proxy discloses that Yemin provided Wiessman with the names of two individuals—Kacal and Wheeler—who had been recommended to Delek through industry contacts and Delek Board members.[183]

---

[181] *Id.* at 87.

[182] *Id.*

[183] *Id.*

Plaintiff contends that the Proxy's disclosures about Kacal's and Wheeler's nomination to the Board are "demonstrably false,"[184] and that the "only reason Wiessman and the rest of the Alon Board approved Wheeler and Kacal to replace Morris and Pery was that Delek demanded the change."[185] This is inferable because Morris's replacement could not conceivably ensure compliance with NYSE listing standards, according to Plaintiff.

Accepting Plaintiff's allegations as true, it is reasonably conceivable that the disclosures concerning Morris and Pery are deficient. Development of the factual record will be required to confirm or disabuse Plaintiff's theory of materiality on this topic.

### 5. The Confidentiality Agreement

The Proxy discloses that "Alon and Delek entered into a confidentiality agreement to permit the exchange of certain non-public information" on December 23, 2015, and then amended that agreement on July 8, 2016.[186] Because "Delek invoked the terms of the Confidentiality Agreement when seeking to bar the Special Committee from publicly disclosing its proposal to merge with Delek,"[187] Plaintiff argues that a reasonable stockholder would consider it important to know

---

[184] Pl.'s Ans. Br. at 61.

[185] Second Am. Compl. ¶ 78.

[186] Proxy at 86, 100.

[187] Pl.'s Ans. Br. at 63.

the terms of the original and amended confidentiality agreement, as well as the circumstances necessitating the amendment.

Defendants respond that whether the December 2015 amended Schedule 13D discloses the execution of the confidentiality agreement is "irrelevant, because the Proxy does."[188] Defendants further respond that information regarding the reasons for and terms of the amended confidentiality agreement are not material because the "Proxy makes clear that the parties exchanged confidential information to facilitate their respective analyses, particularly regarding synergies."[189] On this point, Plaintiff fails to state a disclosure deficiency. Disclosing "why" the confidentiality agreement was amended is unlikely to alter the total mix of information available to stockholders.[190]

### 6. Wiessman and Haddock's post-merger Board service

The Special Committee negotiated for the right to appoint post-merger a director on each of the boards of Holdco and a Delek affiliate, Delek Logistics, and that Wiessman and Haddock would fill these positions, which the Proxy discloses.[191]

---

[188] Delek Defs.' Opening Br. at 67 (emphasis omitted).

[189] *Id.*

[190] *In re Sauer-Danfoss Inc. S'holders Litig.*, 65 A.3d 1116, 1131 (Del. Ch. 2011) ("Asking 'why' does not state a meritorious disclosure claim.").

[191] Proxy at 165 ("Alon's directors and executive officers have interests in the Alon Merger that may be different from, or in addition to, those of other stockholders of Alon generally. In the case of Alon's directors, these interests include . . . potential service on the Delek Board or the board of directors of the general partner of Delek Logistics if selected by the

The Proxy, however, fails to disclose the compensation Wiessman and Haddock were set to receive for their post-merger Board service and that Wiessman would continue as Executive Chairman of Alon Partners G.P. It is reasonably conceivable that Alon's stockholders would view the post-merger compensation provided to Alon's lead negotiator, Wiessman, to be material in deciding how to vote on the merger.[192]

### 7. Delek's planned post-merger acquisition of the Partnership

Plaintiff alleges that before the parties announced the merger, Delek developed a plan to acquire the remaining 18.4% of the Partnership's publicly held limited partner interests. The Proxy and June 21 8-K, however, do not disclose that planned acquisition. Plaintiff contends this omission is material because Delek negotiated the acquisition contemporaneously with the merger, and a reasonable stockholder would find this information important in evaluating the terms of the merger.[193]

---

Special Committee pursuant to its right to nominate one person to each such board of directors, as described in the merger agreement[.]").

[192] *See In re Xura, Inc., S'holder Litig.*, 2018 WL 6498677, at *12 (Del. Ch. Dec. 10, 2018) (disclosure violation pled where it was reasonably conceivable that the public disclosures failed to disclose that the acquirer's affiliate "made clear its intention to work with [the target's] management . . . after consummation of the Transaction in all of its offer letters to the Company").

[193] Pl.'s Ans. Br. at 64–65.

Taking Plaintiffs allegations as true, Alon's interest in the Partnership was a material asset. It is reasonably conceivable that a plan to build upon that asset for the benefit of the post-merger entity would be material to a stockholder deciding how to vote on the merger. That the plan was publicly disclosed separate and apart from the Proxy does not absolve the Director Defendants of their responsibility to include all material information regarding the merger in the Proxy.[194]

## III. CONCLUSION

Count I is dismissed as to the Director Defendants. Count IV is dismissed to the extent it is pled against Holdco and to the extent it asserts a disclosure claim against Delek. Count V is dismissed to the extent it asserts a disclosure claim with respect to the confidentiality agreement. Defendants' motions to dismiss are otherwise DENIED.

---

[194] *See In re Trans World Airlines, Inc. S'holders Litig.*, 1988 WL 111271, at *10 (Del. Ch. Oct. 21, 1988) (rejecting argument that failure to disclose fair market value figure in proxy was cured by its public disclosure in SEC filings), *abrogated on other grounds by Lynch*, 638 A.2d at 1115–17.